Our first case this morning is number 16-1769, Outdry Technologies v. Geox S.p.A., Mr. Aldrich. Pardon me? We're going to handle an admission. Oh, nothing told me about it. Just hold on one second, we have an admission here also. I think Judge Rayner has a motion. Yes, colleagues, I move for the admission of Nathaniel E. Castellano, who is a member of the Bar and is in good standing with the highest court of the District of Columbia. I have knowledge of his credentials and I'm satisfied that he possesses the necessary qualifications. Nathan, they say that time flies when you're having fun, and I've also heard it say that it flies when you work hard. If the latter is the case, then this past year must have been a blur for you because of your work ethic, and that work ethic has brought excellent product for the court and for my chambers. I've noticed that you've earned the respect of your peers, which speaks highly of your professional character. And with that, I wish you all the luck in the future. And could you stand? Because what I'm going to say, I hear stands in the well of the court a man that is an excellent lawyer and that will be a leading light in the U.S. legal profession. With that, I'll make my motion. All right. Judge Rennie, your motion is granted. Mr. Castellano, welcome to the Bar of this Court. It's a pleasure to have you here. We look forward to seeing you argue someday before us, and I'm sure you'll do an excellent job. Thank you. Peter Stan. Your statement. Do you solemnly swear that you will report yourself as an attorney to counsel for this court, upright and according to law, and that you will support the Constitution of the United States of America? I do. Thank you. Okay, well, we'll press the reset button here and begin with 161769, Outright Technologies v. GXSPA, Mr. Albright. Your Honors, my name is Niko Aldrich. I am an attorney at Schwab v. Williamson & Wyatt, and I represent Appellant Outdry in this case, and thank you for your time. The claims in this case all recite a process for waterproofing leather by directly pressing a membrane to a piece of leather using a dense array of adhesive dots. This avoids pockets where water can build up and create a water cushion on the inside of the leather. GX and the PTAB have managed to proffer that leather gloves made from a ruched or corrugated waterproof glove liner glued to an outer glove only for the purpose of preventing the glove from coming apart read on these claims. Counselor, are any of the claims directed, any in terms of the claims directed to the water pocket solution or problem that you speak of? I believe that the preamble in all of the claims is directed to that. But the claims are not. Well, I believe that the preamble is part of the claims here. They set an antecedent basis for the term leather that comes up. Where does the preamble mention the water cushion? Well, it mentions a process for waterproofing leather, which I think is inherent. That doesn't mention the water cushion. The water cushion? No. I believe that the idea here is implied in the preamble. In the concept of waterproofing leather, it's implied that it's going to prevent water from going through and saturating on the inside. That's what the background of the invention is about. That's what the description of the invention is about in the specification. So I believe that the process for waterproofing leather implies the idea that we're not going to have water cushions developed on the inside. Did you argue to the board that the elimination of water cushions was part of the claim? I believe that that was argued throughout, largely in the context of the meeting. No, but did you ask for a claim construction that would read that into the claim as a requirement? I don't believe that we argued for that as part of the claim construction of process for waterproofing leather. Okay. I believe that that was part of the claim construction of directly pressing that was sought before the PTAB. Where did you argue that directly pressing should be construed as eliminating water cushioning? The construction of directly pressing that was sought before the PTAB was that there had to be direct contact and it had to cover in contact, which meant— Well, that I understand, but there was no mention of avoiding water cushions. Those specific words were not mentioned, Your Honor. Okay. Moreover, Geox and the PTAB both suggest that a person of ordinary skill in the art would have thought to combine this idea with a design for cotton socks, but no evidence or even a rationale was provided to the PTAB for this proposition, and I'd like to start by addressing this latter point. This case is an example of the PTAB failing to identify a motivation to combine prior art. Here, the reason for the PTAB's failure was the petition failed to articulate any motivation to combine prior art, and Geox failed to submit any evidence in support of any theory. Even if the petitioner had identified a reason to combine the prior art, the PTAB must still articulate its reasoning, but the PTAB here only rubber-stamped that the petitioner had provided a rationale, though it did not, without articulating why that alleged reason was sufficient. The PTAB's entire explanation is as follows. Petitioner also provided a rational underpinning for combining the disclosures of Scott and Hayden, which provide guidance for the density and size of adhesive dots to adhere a semipermeable membrane to a porous layer. But combining Scott with Hayden isn't the issue. Geox proposes to combine Scott with Hayden with Thornton, and the PTAB never mentioned that. In essence, the board has simply said Thornton teaches a leather glove made with dots of adhesive. Hayden teaches specific dots of adhesive on cotton socks. It's obvious. That is precisely what KSR and this board's precedence counsel against, using the own inventor's invention as a blueprint to the solution. Geox has now, for the first time in its appeal briefs, tried to articulate a motivation to combine. That explanation, it says, is common sense. But that argument was never raised before the PTAB in any form, and I word-searched the entire record on appeal, the word common sense never appears anywhere, common knowledge, common anything. The PTAB never had the opportunity to review whether it would in fact have been common sense to combine these references. There are numerous reasons why it would not have been, but that argument was raised for the first time on appeal. No evidence regarding common sense was submitted to the PTAB. This court has recently emphasized that the PTAB must articulate a reason why a person having ordinary skill in the art would combine the prior art references in the nuvasive case. It is not adequate to summarize and reject arguments without explaining why the PTAB accepts the prevailing argument, which is exactly what happened here. The PTAB here states that it adopted Geox's arguments. But as in nuvasive, the PTAB failed to provide reasoned explanations for crediting those arguments, which are, quote, nothing more than conclusory statements that a person having ordinary skill in the art would have been motivated to combine prior art references. Even if the PTAB had relied on common sense, which it did not, that would not be enough. Absent some articulated rationale, a finding that a combination of prior art would have been common sense or intuitive is no different than merely stating the combination would have been obvious. That's what this court said in the Van Oz case. Now, do you have any argument? If I interpret the board's statement that the petitioner provided a rational underpinning for making this combination as having adopted the petitioner's arguments, do you have any basis for saying there's no motivation to combine then? Yes, I believe that it was either in nuvasive or in the Van Oz case. It is not enough to simply adopt and rubber stamp. The PTAB itself has to articulate its own reasoning so that this court can review that reasoning. On page 12, for example, of the board opinion, it explains petitioner contends that Scott provides a reason for optimizing the amount of adhesive that Thornton and Hayton teach to apply to a semipermeable membrane, which is to provide good adhesion while maintaining vapor permeability. That sounds like a very good reason. It's articulated by the petitioner. And then just a couple of pages later, the board, in my impression, adopts the petitioner's rationale for making this combination. So why isn't that sufficient? I mean, whether it's right or not, I don't know. Your argument seems to be more procedural than substantive in that you're saying the board didn't articulate a motivation to combine and that it's required to do that. That's something I agree with and I think probably our whole court would. But I don't see how they didn't actually do exactly that in this opinion. To the best that I understand what was put forward in the petition, it said Thornton teaches everything other than the amount of dots and that requires optimization. And then it points to a different patent, Hayton, that has dots, but it never explains why it would have been obvious to a person of ordinary skill in the art looking at Thornton to have adopted the number of dots in Hayton, particularly when that patent relates to cotton socks, a different invention. And in addition, there are a number of reasons why a person would not have looked to Hayton, as we had to address in our reply brief, with respect to common sense because that wasn't articulated prior. So simply saying one patent requires optimization and pointing to another patent I don't think is enough to identify a reason why those two ideas would have been merged. Well, you may not think it's enough, but it's decidedly a question of fact under our law and we've got to give substantial evidence deference, don't we, to the board's decision on it? Yes, substantial evidence deference does have to be given, Your Honor. But again, I think here, combing through the petition and the oral argument, I don't think that any rational reason for combining this art has been provided. What distinguishes this case from Van Oss and Nuvasiv is that in those cases, the PTAB decision was potentially lawful but insufficiently or inappropriately explained, as I think we have obviously here, it's insufficiently or inappropriately explained. I remember the Nuvasiv case quite clearly and the difference there was the board articulated, the petitioner argues, petitioner argues, petitioner argues, and it never adopted the arguments. And it never ever said, we adopt or we find this is a rational underpinning or we agree with the petitioner. There was never a statement, it just articulated, the petitioner argues, and the board was standing in front of us saying, well, because we came to this conclusion, you should assume we adopted the petitioner's arguments. That's a pretty big difference between this case and that case, if I interpret the sentence on page 15 of the board's opinion as adopting the petitioner's arguments. I believe that one difference with the Nuvasiv case is that evidence was actually submitted in that case in the form of expert testimony, but no such evidence was submitted here. I'd like to reserve the rest of my time for reply, if possible. Okay, thank you, Mr. Hall. Thank you. Thank you, Your Honor. Mr. Weirich? Weirich. Weirich, okay. Thank you. Your Honor is correct, the board did not simply rubber stamp and say petitioner is correct. The points that- Yeah, but even if it did that, why would that be a problem? If they articulate in a lot of detail a petitioner's argument and then say we agree with it, what's wrong with that? Exactly, that's my point. The PTAB did not just summarily say we agree with them. The PTAB had an initial summary, then actually looked at the cited art, and Scott itself is a motivational reference. The Scott reference tells you that the amount of adhesive that you want to use to attach a membrane to a fabric is a matter to be optimized, and the reasons Scott gives are very similar to what the applicant argued during the original prosecution before the PTO in obtaining the 171 pet. So Scott itself tells you that the amount of adhesive in using dots to apply a membrane to a fabric is something to be optimized. You then have Hayton that gives us specific examples that overlap with what is claimed, and so we have Thornton that teaches everything except the number of dots and the size of the dots. We have Scott that teaches that that's an issue to be optimized, the amount, because you want to have good adhesion, but you don't want too many dots because that will block the cores, and then we have specific examples that overlap with the ranges that are claimed. And so I think that the PTAB clearly justified its findings. It pointed to the prior art. It just did not summarily say we agree with the petitioner. It actually looked at the citations and looked at the prior art. The other thing that was raised... So what's the motivation for applying waterproofing techniques to stretchable fabric as opposed to leather? We're talking about two items that have totally different properties, and as we look at the references, when you apply the adhesive to a stretchable fabric, you have to do it when the fabric is stretched out to its extent. Then when it collapses, it creates this corrugated effect, correct? Yes, well, the reason that Thornton does that is because if you do have something that's stretchable to which it's going to be applied, when it's in use and it does stretch, you don't want the membrane to break. But Thornton actually specifically says that its process is not only applicable to socks, it's also applicable to leather, and it specifically says the leather glove embodiment can be made using the same process used for the sock embodiment. That's at columns 21 and 22, I believe, of Thornton. Thornton tells us of the interchangeability and also the applicability of processes for fabric or socks to leather, such as leather and gloves. And then Hayton is by the same assignee as Thornton, and it's describing a sock process. And Hayton gives us the particular dot size and dot density that overlaps with the range. I thought it was odd that Outdry now says Hayton is so much different than Thornton that one would not apply the teachings of Hayton to Thornton, because in their opening brief they said they were very similar. I think that's at page 16 of their opening brief. If we were to adopt your opponent's water cushion argument, would that change your arguments that you just made? What part? That that should be part of the claim construction? No, let's say that we agree that a claim element is water cushions. The water cushion problem. Would your arguments change with respect to the motivation to combine the different references? No, I don't think the motivation changes. The argument on the water cushion is that the claims somehow require complete and continuous contact in the regions between the dots. First, that was not argued, as pointed out earlier, that was not argued as part of claim construction before the PTAB. Instead, that was a proposed limitation and a proposed amendment that was rejected and not appealed. And what the PTAB said is that, at best, even if you would consider the claims to preclude formation of a water cushion and to require complete and continuous contact between the dots, that would only bring in the Driscoll reference that was cited during the original prosecution, because Driscoll teaches applying two flat articles to each other with no roofing or corrugation. That was in the Driscoll reference cited during the original prosecution. The only thing that Driscoll did not teach was the size and density of the dots, and that's why the claims were allowed during the original prosecution. In the IPR, we have Thornton, which teaches interchangeability or applicability to both leather and fabric of the same processes. In addition to that, we have Scott that teaches the amount of the dots that you want to use is a matter to be optimized. And then we have Hayton that gives us specific examples of the dot size and dot density that are in the claims. And so it all fits together, and as the PTAB found, and this is in the section of the PTAB's written opinion relating to the rejection of their amendment, because that's where it was raised below. It's around pages 25 to 27. They said even if you would accept that water cushion and complete and continuous contact argument, at best that would only bring Driscoll into play because Driscoll teaches using dots to apply two flat articles together with the membrane being directly applied to the leather. Anything further? I have nothing further. Okay. Thank you, Mr. McMartin. Mr. Aldrich. Council just spoke about the interchangeability within Thornton. Thornton teaches a process for making leather gloves and says that certain aspects of making fabric can be incorporated into that, but that the leather glove manufacturer is a separate process where you first build an internal glove liner and then insert it into the leather glove. The dots that would be used for that purpose would inherently be different than dots used in other purposes for the reasons that are explained in our brief. The glove liner will shrink, and the only purpose of gluing the glove liner to the outside glove is to prevent the glove from coming apart when you pull your hand out. But doesn't the liner become a membrane at that point in time that waterproofs the glove? The membrane is a waterproof barrier that prevents water from getting to your hand, indeed. The point about Scott, first of all, Scott has nothing to do with leather. In fact, Scott doesn't have anything to do with the dot density that you would apply on leather. Scott has to do with the density that you would put on a waterproof membrane in order to prevent the pores in the membrane, the micropores in the membrane, from being clogged by the glue. That has nothing to do with the, and it specifically says in Scott that it relates to fabric. So there's nothing in Scott that teaches the density that you would apply, the density of dots that you would apply in putting a membrane on leather itself. This is the first invention that I'm aware of that discloses the idea of directly gluing with dots a microfiber, a micro-waterproof membrane directly onto leather using a fine array of dots. And then Hayton, again, deals with cotton socks and the idea that the ratio of dots or the number of dots that you would use in building a cotton sock. Again, I don't believe that there's any articulated rationale for, other than this idea of optimization, which I don't think is a rationale. That's a reason searching for a rationale. We need to optimize, but why would you pick, why would somebody of ordinary skill in the art pick Hayton? What about Hayton solves the problem in Thornton? Why would somebody do that? And that's what seems to be lacking in both the PTAB's final written decision and also in Geox's papers. Very quickly on directly pressing, again, I think this was well covered in the briefs, but the context of the claims here is building a waterproof leather sheet that can be incorporated into products like shoes without water cushions. And somehow we've gotten to the point where a corrugated, ruched liner that intentionally has air pockets. Thornton specifically says that there's a benefit of those air pockets. They are there to provide insulation. So you use the term water cushions again, and the way I read the material, the water cushions creates a space between the liner and the outer material. And if you have space there, then water gets in it. That's the water cushion, correct? Correct. But if you have a situation where you have a liner and you glue it onto the outer surface, and even though there's space, such as we see in Hayden, as long as you have a waterproofing effect, doesn't that resolve the water cushion problem? No, the patent is about shoes, and you don't want bubbles of water in your shoes. You don't want water cushions in your gloves either, right? That doesn't seem to be a concern for Thornton. Thornton says that there's a benefit in having these air pockets in there for insulation. Not on the leather embodiment. Pardon? Not on the leather embodiment. Oh, in the leather embodiment as well, yes. You build the internal lining and then you collapse it, allowing it to shrink, so that you end up with this ruched membrane liner internal structure that you then glue to the outer glove. That's the whole idea of Thornton, is to build that structure like that so it has the flexibility on your hand. So the entire purpose of the invention is to… Where does Thornton say that you have ruches in connection with the glove embodiment? I would have to dig it out, Your Honor, and I believe my time is up, but it explains that the liner is made by building it on a former that's large. Okay, I think we're out of time. Thank you, Mr. Allrush. Thank you for your time, Your Honor.